UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
MARIA DEL CARMEN ROBAINAS, GIOVANNI     :        14cv9926 (DLC)
VALLADARES, JOSE A. CAPABLANCA,         :
MODESTO MARTIN, JACQUELINE J. RUSS,     :        OPINION AND ORDER
ALLEN PEREZ and GREGORY TRUITT,         :
                                        :
                  Plaintiffs,           :
                                        :
          -v-                           :
                                        :
METROPOLITAN LIFE INSURANCE COMPANY     :
and METLIFE, INC.,                      :
                                        :
                  Defendants.           :
                                        :
--------------------------------------- X

APPEARANCES:

For Plaintiffs:

David J. Harth
John S. Skilton
Timothy W. Burns
Jeff J. Bowen
Eric G. Barber
Freya K. Bowen
Jesse J. Bair
Perkins Coie LLP
One East Main Street, Suite 201
Madison, WI 53703

Keith W. Miller
Perkins Coie LLP
30 Rockefeller Plaza, 22nd Fl.
New York, NY 10112

Shawn M. Raiter
Larson King LLP
30 East Seventh Street, Suite 2800
Saint Paul, MN 55101

William R. Scherer, Jr.
Albert F. Frevola, Jr.
Joshua D. Clark
Conrad & Scherer LLP
633 South Federal Highway, 8th Fl.
Fort Lauderdale, FL 33301

Peter B. Katzman
Mazzeo Song & Bradham LLP
444 Madison Avenue, 4th Fl.
New York, NY 10022

Shanon J. Carson
Glen L. Abramson
Patrick F. Madden
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103

Kai H. Richter
Nicholas Kaster, PLLP
4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

For Defendant:

Patrick Joseph Gennardo
Sandra Denise Hauser
Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020

DENISE COTE, District Judge:

 Plaintiffs Maria Robainas and others ("Plaintiffs") brought a putative class action on behalf of those who purchased life insurance from Metropolitan Life Insurance Company ("MLIC" or "Defendant").[1]  MLIC moves to dismiss the complaint on four

---

[1] MetLife, Inc. ("MetLife") was originally named as a defendant in this action.  On February 3, 2015, the parties stipulated to

grounds: (1) the Plaintiffs lack standing under Article III; (2) the Plaintiffs fail to state a claim under Fed. R. Civ. P. 12(b)(6); (3) the primary jurisdiction doctrine bars the Court from adjudicating this action; and (4) the statute of limitations has run.  For the reasons that follow, the Plaintiffs do not have Article III standing because they have failed to demonstrate that they suffered an injury-in-fact.  The Court therefore lacks subject-matter jurisdiction over the action and MLIC's motion to dismiss is granted.

## Background

The following facts are asserted in the complaint and taken from documents integral to those claims.  The Plaintiffs are a putative class of MLIC policyholders and more than two thirds of class members live outside of New York.  MLIC is a life insurance company incorporated in New York with its principal place of business in New York.

In general, life insurance provides money to beneficiaries after an insured person's death, helping to defray the costs associated with losing a loved one.  Policyholders may buy life

---

dismiss all claims against MetLife.  There are two related cases that have been consolidated and stayed pending the outcome of this motion to dismiss: Intoccia v. Metropolitan Life Insurance Co., 15cv3061, and Weilert et al. v. Metropolitan Life Insurance Co., 15cv3375.  The parties in another related case, Yale v. Metropolitan Life Insurance Co., 15cv00199, have stipulated that the Yale case would be consolidated into the Robainas matter and that Robainas is the lead case.

insurance as individuals or as part of a group plan, often through their employer.  The cost of a life insurance policy may reflect the financial health of the insurer, and MLIC advertises that it is in good financial condition.

MLIC is regulated by the New York State Department of Financial Services ("NYDFS").  In order to guarantee that life insurance companies can pay claims when they come due, New York regulations require that insurers establish reserve liabilities ("reserves").  These reserves must contain "admitted assets," which are assets that can be reliably liquidated to pay claims immediately when they become due.  State regulators determine the required reserve amounts using established formulas.  These formulas, however, leave open the possibility that a devastating mortality event or market disruption could leave insurance companies unable to pay claims.  Regulators also monitor MLIC's risk-based capital ("RBC") ratio, which is the ratio of the insurer's total capital to the minimum capital required under the reserve formula.  RBC ratios are important in evaluating the financial condition of a life insurance company.

## I.   Reinsurance

Many insurers obtain reinsurance to help minimize the risks involved in offering insurance.  With reinsurance, the primary insurer ("ceding insurer") contracts with another insurer to carry all or part of the risk assumed by the primary insurer in

writing the original policy.  Primary insurers -- such as MLIC -
- may claim a "reserve credit" through reinsurance, which has
the effect of reducing the assets a primary insurer must
maintain in support of its reserves.  Primary insurers remain
ultimately responsible for paying policyholder claims, even when
those claims are covered by reinsurance agreements.

New York regulators permit primary insurers to take reserve
credits for reinsurance only when that reinsurance meets certain
requirements.  There are two types of reinsurance that
regulators deem sufficiently safe to allow a reserve credit: (1)
where the reinsurer is authorized by the primary insurer's
regulator; and (2) where the reinsurer is unauthorized but posts
adequate, easily-liquidated collateral for the reinsurer's
obligation.  The collateral posted by unauthorized reinsurers
typically consists of a trust maintained with a U.S. financial
institution or irrevocable letters of credit ("LOC") from a U.S.
financial institution.  A primary insurer may seek reinsurance
from a "captive" reinsurer, which is affiliated with the primary
insurer's parent, provided that the captive reinsurer is
authorized in New York or able to meet the same conditions set
forth for unauthorized reinsurers.

## II. "Shadow Insurance"

Some New York life insurers use a tactic called "shadow
insurance" to escape these regulatory requirements for captive

5

reinsurance.  In July 2012, NYDFS investigated the shadow
insurance practices of New York life insurance companies.  The
NYDFS issued a report of its findings in 2013 ("Report").  The
Report found that, in a typical shadow insurance transaction,
primary insurers use a captive subsidiary located offshore or in
another jurisdiction with lax regulations governing the
reinsurer's collateral.  Using reinsurers subject to looser
regulatory requirements allows the primary insurer to take a
reserve credit without meaningfully reducing its own risk.

Four specific types of shadow insurance transactions caused
the NYDFS greatest alarm.  These are "hollow asset"
transactions, "naked parental guarantees," "conditional letters
of credit," and "two-step transactions."  A "hollow asset" is a
letter of credit with a parental guarantee that is recorded as
an asset on the books of a captive reinsurer, when such a letter
of credit is not a "real asset."  A "naked parental guarantee"
occurs when the captive reinsurer does not obtain a letter of
credit, but simply promises that its parent company will cover
its losses.  A "conditional letter of credit" is a letter of
credit that has stipulated conditions that must be met before it
can be drawn upon, which is riskier than an unconditional letter
of credit.  "Two-step transactions" involve a New York primary
insurer ceding risk to a non-New York based affiliate, who then
again reinsures the risk to a company affiliated with the

primary insurer.  Shadow insurance transactions reduce the reserve liabilities of primary insurers by providing them with an avenue for obtaining reserve credits without meaningfully reducing their risk.  This artificially increases an insurer's RBC ratio.  This increase has the effect of making the primary insurer appear more financially stable than it actually is, which in turn could inflate its ratings or manipulate those who rely on the RBC ratio for determining an insurer's financial health.

These shadow insurance transactions also lead to increased risks for policyholders.  In particular, parental guarantees do not result in a meaningful transfer of risk from the primary insurer to the captive reinsurer.  Thus, in the event of a crisis, primary insurers may not have sufficient liquid capital to pay life insurance claims.  Further, because the financial health of a primary insurer is linked to the financial stability of its parent, if a bank declines to renew a parent company's LOC supporting a primary insurer's reserve credit, the primary insurer may be unable to find other sources of funding to pay its claims.

## III. MLIC's Conduct and Plaintiffs' Claims

MLIC, a wholly-owned subsidiary of MetLife, Inc. ("MetLife"), uses captive and offshore reinsurance companies to reinsure its policies.  According to Plaintiffs, MLIC is

identified as "Case 1" in the NYDFS Report.  MLIC is well-rated by all of the ratings agencies, including Moody's and Standard & Poor's.  Both MetLife and MLIC advertise their financial strength in order to compete with other insurers.

Plaintiffs' complaint details several shadow insurance transactions by MLIC.  For example, MLIC obtained a reserve credit from four LOCs totaling $1,184,000,000 that were used by its captive affiliate, MetLife Reinsurance Company of Vermont ("MRV"), and its offshore affiliates, Exeter Reassurance Company Ltd. and Missouri Reinsurance (Barbados), Inc.  MLIC did not disclose that these LOCs were backed by contractual parental guarantees, meaning that the agreements did not actually transfer as much risk as it appeared from MLIC's regulatory filings.  MLIC's reserve credit included a $315 million LOC that the Report determined was a "hollow asset," even though MLIC reported it as an admitted asset.  MLIC also used two-step transactions with non-New York affiliates who then ceded their risk to captive reinsurers.  MLIC's RBC ratio improved by 109% after it entered into these shadow insurance transactions. Further, in its 2011 Annual Statement, MLIC reported that it took a reserve credit in the amount of $2,947,745,838.  The reserve credit was based, in part, on the transactions with MLV and other captive reinsurers.

Plaintiffs allege that MLIC did not disclose these shadow insurance transactions and therefore violated § 4226(a)(4) of the New York Insurance Law.  The statute prohibits insurers from "mak[ing] any misleading representation, or any misrepresentation of the financial condition of any such insurer or of the legal reserve system upon which it operates."  In support of their allegations, Plaintiffs claim that MLIC did not disclose its parental guarantees in its annual required disclosures.[2]  Further, MLIC reported shadow insurance transactions as if they transferred risk to the same extent as the captive reinsurance transactions that satisfied regulatory requirements.  Thus, the Plaintiffs claim, MLIC rendered its annual disclosures materially misleading by failing to describe the true nature of the shadow insurance transactions and reporting an artificially inflated RBC ratio.  Ratings agencies, regulators, and the general public rely on these annual statements in assessing the financial strength of life insurance companies.  In sum, Plaintiffs allege that by not reporting shadow insurance transactions as such, MLIC overstated its financial health (through an inflated RBC ratio) and misled the public.

---

[2] MLIC's annual disclosures are governed by N.Y. Ins. Law §§ 307(a) and 4233(b) as well as detailed accompanying regulations.

Section 4226(d) provides that "[a]ny such insurer that knowingly violates any provision of this section . . . shall, in addition to any other penalty provided in this chapter, be liable to a penalty in the amount of such premium . . . which penalty may be sued for and recovered by any person aggrieved for his own use and benefit."  Plaintiffs claim that, as "aggrieved" policyholders, they have a cause of action against MLIC for "knowing" misrepresentations that violate § 4226(a)(4). According to the complaint, Plaintiffs were "aggrieved" because they paid premiums for MLIC's life insurance policies and are thus within the zone of interests the statute seeks to protect; Plaintiffs argue that § 4226(d) does not require that they experience any injury or suffer any damages.

In any event, Plaintiffs claim four injuries: (1) Plaintiffs paid premiums for life insurance policies that are less financially secure than MLIC represented them to be; (2) Plaintiffs paid inflated premiums for life insurance policies; (3) in the future, MLIC may not be able to pay its claims because of its use of shadow insurance; and (4) the Plaintiffs' statutory right to full and accurate disclosures from their insurers has been violated.  Importantly, the named Plaintiffs do not contend that they specifically read, heard, or relied on MLIC's alleged misstatements beyond a general allegation that MLIC misled the public, including policyholders.

10

## Discussion

When deciding a motion to dismiss under Rule 12(b), Fed. R. Civ. P., a court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor."  LaFaro v. New York Cardiothoracic Group, PLLC, 570 F.3d 471, 475 (2d Cir. 2009).  Where Article III standing is at issue, "[e]ach element of standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation."  Carver v. City of New York, 621 F.3d 221, 225 (2d Cir. 2010) (citation omitted).  "Because standing is challenged here on the basis of the pleadings, we therefore accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  Id. (citation omitted).

In deciding a motion to dismiss, the court considers "any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference."  Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 100 (2d Cir. 2015) (citation omitted).  The Plaintiffs have attached five exhibits to the complaint, including the NYDFS Report on shadow insurance.

Article III of the United States Constitution limits the jurisdiction of the federal courts to "cases" and

11

"controversies."  U.S. Const. art. III, § 2.  "In order to ensure that this bedrock case-or-controversy requirement is met, courts require that plaintiffs establish their standing as the proper parties to bring suit."  W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106 (2d Cir. 2008) (citation omitted).  Article III's standing requirement consists of three elements: "(1) injury in fact, which must be (a) concrete and particularized, and (b) actual or imminent; (2) a causal connection between the injury and the defendant's conduct; and (3) that the injury is likely to be redressed by a favorable decision."  Kreisler v. Second Ave. Diner Corp., 731 F.3d 184, 187 (2d Cir. 2013) (citation omitted).  "[T]he requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute."  Summers v. Earth Island Inst., 555 U.S. 488, 497 (2009).  Further, the "'injury in fact' test requires more than an injury to a cognizable interest.  It requires that the party seeking review be himself among the injured."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 563 (1992) (citation omitted).

That this is a class action does not change these standing requirements.  "[E]ven named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class."  Lewis v. Casey, 518 U.S. 343, 357 (1996) (citation

omitted).  Thus, "a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual injury . . . and (2) that [the defendant's] conduct implicates the same set of concerns" for the rest of the class.  Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon, 775 F.3d 154, 161 (2d Cir. 2014) (citation omitted).  Further, "[i]n an era of frequent litigation [and] class actions . . . courts must be more careful to insist on the formal rules of standing, not less so." Arizona Christian Sch. Tuition Org. v. Winn, 131 S. Ct. 1436, 1449 (2011).

The first requirement for Article III standing is in dispute here.  MLIC argues that, because Plaintiffs have not suffered an actual injury-in-fact beyond the mere violation of § 4226(a)(4), they do not have Article III standing.  Plaintiffs counter that §§ 4226(a)(4) and (d) together create a statutory right to be free of misrepresentation by life insurance companies and Plaintiffs experienced an injury when MLIC violated that statutory right.

As an initial matter it is important to clarify the distinction between statutory standing and Article III, or constitutional, standing.  For statutory standing, "the question is whether the plaintiff has a cause of action under the statute." Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n, 768 F.3d 183, 201 (2d Cir.

2014) (citation omitted).  In other words, statutory standing
"is an issue that requires [courts] to determine, using
traditional tools of statutory interpretation, whether a
legislatively conferred cause of action encompasses a particular
plaintiff's claim."  Lexmark Int'l, Inc. v. Static Control
Components, Inc., 134 S. Ct. 1377, 1387 (2014).  New York
Insurance Law § 4226(d) undoubtedly provides a cause of action
to aggrieved policyholders.  That is, under the statute,
policyholders "aggrieved" by "knowing" violations of §
4226(a)(4) may sue to recover premiums they paid.

Constitutional standing, on the other hand, requires a
court to determine whether the Article III requirements of
injury-in-fact, causation, and redressability are met in light
of both the statutory scheme and the facts of the plaintiff's
individual case.  Lujan, 504 U.S. at 571-74 (finding that
Congress could not use a "citizen suit" provision to authorize a
cause of action without satisfying Article III).  The
distinction between statutory and constitutional standing is
vital because, even if Plaintiffs have a cause of action under §
4226(d), they must also satisfy Article III by showing that they
have suffered a concrete injury.

The Plaintiffs have not demonstrated a sufficiently
concrete injury in this case.  The first of Plaintiffs' theories
of injury is that they purchased policies that were riskier than

14

MLIC represented them to be.  But, as the Honorable Jesse Furman recently held in dismissing claims challenging shadow insurance transactions, "absent any real or impending injury arising from [MLIC's] practices and nondisclosures, Plaintiffs' conclusory allegations of current risk do not suffice to confer Article III standing."  Ross v. AXA Equitable Life Ins. Co., -- F. Supp. 3d --, 2015 WL 4461654 at *10, (S.D.N.Y. July 21, 2015).  Further, "Plaintiffs do not allege that they would not have purchased policies . . . but for its nondisclosures."  Id.

Plaintiffs also claim that they paid higher premiums for insurance policies than they would have absent MLIC's failure to disclose its shadow insurance.  This is the closest the Plaintiffs come to articulating a cognizable injury under Article III; however, this conclusory assertion of such injury without any plausible basis does not confer standing on the Plaintiffs.  Indeed, according to an economic study annexed as an exhibit to the complaint, using shadow insurance actually reduces the cost of life insurance policies and, if companies discontinued using shadow insurance, premiums might rise by as much as 10-21%.[3]

Plaintiffs further claim that, as a result of its use of shadow insurance, MLIC may be unable to pay their life insurance

---

[3] Ralph S.J. Koijen & Motohiro Yogo, Shadow Insurance, Nat'l Bureau of Econ. Res. 3 (2013).

claims in the future.  In order for such a future injury to satisfy Article III, it must be "actual and imminent, not conjectural or hypothetical."  <u>Summers</u>, 555 U.S. at 493. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative . . . that the injury is <u>certainly</u> impending."  <u>Clapper v. Amnesty Int'l USA</u>, 133 S. Ct. 1138, 1147 (2013) (citation omitted).  Plaintiffs' claim that MLIC may in the future be unable to meet its obligations is too "hypothetical, speculative, and uncertain" to satisfy Article III.  <u>Ross</u>, 2015 WL 4461654, at *10.  Such "allegations of <u>possible</u> future injury are not sufficient."  <u>Clapper</u>, 133 S. Ct. at 1147 (citation omitted).

The Plaintiffs' last claimed injury is that §§ 4226(a)(4) and (d) together create a statutory right to be free from misrepresentation by their insurer, and that the existence of this right is sufficient to create Article III standing. Although states may create a statutory cause of action where none exists in federal law,[4] states may not bypass constitutional

---

[4] Indeed, this is a fundamental premise of diversity jurisdiction, where federal courts apply state substantive laws that create legal rights and causes of action without federal parallels.  <u>See</u> <u>FMC Corp. v. Boesky</u>, 852 F.2d 981, 993 (7th Cir. 1988).

or prudential[5] standing requirements.  Plaintiffs still must demonstrate a concrete injury-in-fact, even if that injury is based on a deprivation of a right created under state law.

Even our national legislature may not bypass the constitutional requirements of standing.  While "Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules . . . Article III's requirement remains: the plaintiff still must allege a distinct and palpable injury to himself."[6]  Warth v. Seldin, 422 U.S. 490, 501 (1975).[7]  Cases recognizing that a federal statutory

---

[5] Prudential standing requirements are court-imposed limits on federal jurisdiction and are not at issue in this case.  These requirements include the "reluctance to entertain generalized grievances," for example.  Lexmark, 134 S. Ct. at 1387 n.3.

[6] The Ninth Circuit recently held that mere violation of a statutory right, without an accompanying harm, is sufficient to satisfy the Article III injury requirement.  Robins v. Spokeo, 742 F.3d 409, 412-13 (9th Cir. 2014).  The Supreme Court granted certiorari on the question of whether "Congress may confer Article III standing upon a Plaintiff who suffers no concrete harm, and who therefore could not otherwise invoke the jurisdiction of a federal court, by authorizing a private right of action based on a bare violation of a federal statute." Robins v. Spokeo, Inc., 2014 WL 1802228 (U.S.), cert. granted, 135 S. Ct. 1892 (2015).  The Supreme Court's answer to this question could affect the analysis here, which relies on current law requiring that the invasion of a statutory right encompass a concrete injury-in-fact.

[7] As Judge Furman recently explained, it is far from clear that state legislatures have the power to confer standing on persons whose claims would ordinarily be barred by prudential standing rules.  Ross, 2015 WL 4461654 *8 (discussing cases); see Hollingsworth v. Perry, 133 S. Ct. 2652, 2667 (2013) ("[S]tanding in federal court is a question of federal, not

violation can confer standing rely on finding a concrete injury
in making that determination.  For example, although Congress
had a "general interest in safeguarding the integrity of the
stock market" when it enacted § 16(b) of the Securities Exchange
Act of 1934 and required short-swing profits to be disgorged,
"it did not eliminate the injury requirement of standing."
Donoghue v. Bulldog Investors Gen. P'ship, 696 F.3d 170, 180 (2d
Cir. 2012).  The breach of a fiduciary duty and reputational
interest in avoiding insider trading provided a concrete
personal stake in the suit to satisfy Article III.  Id. at 177-
78.  Other cases in which the Court of Appeals has addressed
statutory violations and the concrete injury requirement have
similarly required that the statutory violation constitute a
palpable deprivation.  E.g., E.M. v. New York City Dep't of
Educ., 758 F.3d 442, 456-57 (2d Cir. 2014) (finding that a
plaintiff had standing because her contractual obligation to pay
private school tuition was a concrete injury, which was required
even for statutorily-created rights); Kendall v. Employees Ret.
Plan of Avon Products, 561 F.3d 112, 118 (2d Cir. 2009) (holding
that a "plan participant suing under ERISA must establish both
statutory standing and constitutional standing, meaning the plan

state law. . . . [T]he fact that a State thinks a private party
should have standing to seek relief for a generalized grievance
cannot override our settled law to the contrary.").

participant must . . . assert a constitutionally sufficient injury arising from the breach of a statutorily imposed duty").

In any event, the Plaintiffs' reliance on § 4226(d) to supply their standing in the absence of any concrete injury is misplaced.  The statute appears to require a plaintiff to experience a concrete injury in order to state a cause of action.  Section 4226(d) grants a cause of action to policyholders who were "aggrieved" by "knowing" misrepresentations about an insurer's reserves.  Although "aggrieved" sometimes has a statute-specific meaning, see In re Barnet, 737 F.3d 238, 242 (2d Cir. 2013) (defining "person aggrieved" in bankruptcy appeals as a person "directly and adversely affected pecuniarily" by the challenged ruling), the term has not yet been defined in the context of § 4226(d).  Where a "statute does not define a term, we give the term its ordinary meaning." Laurent v. PricewaterhouseCoopers LLP, 794 F.3d 272, 281 (2d Cir. 2015) (citation omitted).  Webster's New Riverside University Dictionary 86 (2d ed. 1984) defines "aggrieve" as "[t]o distress or afflict" or "[t]o injure unjustly."  "Aggrieved" is similarly defined as "[t]reated wrongly." Id.  These definitions indicate that an aggrieved party is one that experiences some sort of wrong or harm, which is consistent with the ordinary meaning of the term.

The Supreme Court and the Court of Appeals have in several cases embraced this definition when interpreting "aggrieved." For example, courts have understood "aggrieved" as requiring an injury-in-fact coextensive with the requirements of Article III. See, e.g., Fed. Election Comm'n v. Akins, 524 U.S. 11, 19 (1998) ("History associates the word 'aggrieved' with a congressional intent to cast the standing net broadly," beyond the scope of prudential standing requirements but still subject to Article III);[8] Green Island Power Auth. v. F.E.R.C., 577 F.3d 148, 158 (2d Cir. 2009) ("A party is 'aggrieved' if it can establish that it has both constitutional and prudential standing" to challenge an agency's order); Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 47 (2d Cir. 1997) ("[T]he Rehabilitation Act extends its remedies to 'any person aggrieved.' . . . [T]he use of such broad language in the enforcement provisions of the statutes evinces a congressional intention to define standing . . . as broadly as is permitted by Article III." (citation omitted)).

---

[8] This definition of "aggrieved" does not hold for every statute. Thompson v. N. Am. Stainless, L.P., 562 U.S. 170, 176-77 (2011) (declining to extend an earlier decision defining "aggrieved" as coextensive with Article III's limits, instead finding that the term embodies the "zone of interest" test for suits under Title VII).  Reading "aggrieved" as existing at the outer bounds of Article III standing represents an effort to interpret the term as expansively as federal jurisdiction allows while avoiding a potentially complex area of statutory interpretation.

But, even if § 4226(d) does not require a plaintiff to have experienced a concrete injury, Plaintiffs still must satisfy Article III.  "Art. III's requirement remains: the plaintiff must still allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants."  <u>Warth</u>, 422 U.S. at 501.  Plaintiffs have not alleged that MLIC's purported violation of § 4226 caused them such an injury, and therefore they do not have standing under Article III.

## Conclusion

MLIC's May 22, 2015 motion to dismiss is granted.  The Clerk of Court shall enter judgment for MLIC and close the case.

Dated:    New York, New York
          October 9, 2015


_____
                DENISE COTE
        United States District Judge